# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal

|  |  |
|---|---|
| GLENN LOOMIS, KOWSILLIYA LOOMIS, and RAINY DAY VENTURES, LLC,<br><br>Claimants,<br><br>vs.<br><br>PREMIER FRANCHISING GROUP, LLC, BARRY VAN OVER, MYLES BAKER, BRENT SEEBOHM, FRANCHISE FASTLANE, LLC, and UNLEASHED BRANDS, LLC,<br><br>Respondents. | Case No. 01-23-0005-4427 |

**ORDER ON ARBITRABILITY**

1. This dispute was first brought on November 18, 2022 by Claimants, as plaintiffs with numerous others, in a lawsuit in the U.S. District Court for the Eastern District of Tennessee (*Anthony, et al. v. Van Over, et al.*, Case No. 3:22-cv-00416 (E.D. Tenn.)). On September 27, 2023, the Court ruled in a Memorandum Opinion and Order ("Opinion") that the franchise agreements signed by the Parties contained arbitration clauses, which provided that an arbitrator must determine the arbitrability of the claims at issue in the lawsuit. The Court granted defendants' motions to compel arbitration and stayed the lawsuit pending the conclusion of the arbitration.

2. On November 21, 2023, Claimants submit a Demand for Arbitration to the American Arbitration Association ("AAA") based upon their First Amended Complaint filed in District Court. The AAA thereafter appointed this Arbitrator without objection from any party. Respondents have denied the allegations in the First Amended Complaint. At the preliminary conference on May 13, 2024, the Parties agreed that the issue of arbitrability should be resolved first. Procedural Order No. 1 established an agreed-to schedule for the Claimants' motion on arbitrability.

3. Claimants filed their Objection to Arbitrability on May 21, 2024 ("Objection") and then a Notice of Supplemental Authority and Request on May 31, 2024 ("Notice") regarding a new Supreme Court case, *Coinbase v. Suski*, No. 23-3, 2024 WL 2333424 (U.S. May 23, 2024). Procedural Order No. 2 amended the schedule by agreement to accommodate the Notice to brief the *Coinbase* issue separately. On June 5, 2024, Respondents filed three separate responses to the Objection: (a) by Respondents Premier Franchising Group LLC, Unleashed Brands, LLC, and Myles Baker, (b) by Mr. Van Over, and (c) by Fastlane, LLC and Mr. Seebohm. On June 12, 2024,

Claimants filed three separate reply briefs to each group of Respondents, and Respondents filed three separate responses to the Notice.

4. After Claimants objected to Respondents' last submission, Procedural Order No. 3 denied a request to strike or allow a sur-reply and ordered oral argument. The order also denied Claimants' request for a stay pending a motion for reconsideration to the District Court based upon *Coinbase.* The Arbitrator was later informed that the District Court denied the motion for a stay. Oral argument with all parties represented was held by Zoom on July 11, 2024 at 1PM EDT.

### A. The Parties

5. Claimants, Glenn Allen Loomis and Kowsilliya Ramnaresh are the co-owners of the franchisee, Rainy Day Venture, LLC ("Loomis Group").

6. Respondent Premier Franchising Group ("PFG") is a nationwide martial arts chain and franchisor under a franchise agreement. Respondent Myles Baker is a vice-president of PFG.

7. Respondent Unleashed Brands, Inc. ("Unleashed") is the wholly-owned parent company of PFG (collectively with PFG and Mr. Baker, "PMA Respondents.")

8. Respondent Franchise FastLane LLC ("FastLane") is a marketing contractor for PFG and Brent Sheebolm is employed by FastLane.

9. Respondent Barry Van Over is the founder and former CEO of PGF.

### B. First Amended Complaint

10. While the First Amended Complaint involves 54 franchises, this arbitration involves one franchisee and its two owners in the Loomis Group. Four agreements relevant to the issue of arbitrability have been referenced in the complaint or briefing: a Franchise Agreement dated June 23, 2021 with an arbitration clause ("Franchise Agreement") and an Area Development Agreement with a district court forum selection clause signed the same day ("ADA"). An Entry Transfer Addendum dated August 16, 2021 ("Addendum") and the First Amendment to Franchise Agreement dated March 1, 2022 ("First Amendment") amended or added to terms in the Franchise Agreement. The Group's Franchise Agreement is specifically alleged in the complaint. Compl. ¶529. The ADA is generally referenced (Compl. ¶854), and the Addendum and First Amendment have been provided as exhibits to the briefing.

11. In the First Amended Complaint, plaintiffs allege that PMA Respondents engaged in an ongoing, multiyear scheme to defraud them to buy and attempt to operate martial arts studios as PFG franchises. According to the complaint, Respondent Van Over hired FastLane and Mr. Sheebolm "to change the pitch." Compl. ¶3. The new pitch allegedly was based on false statements to advance the Respondents' efforts to sell as many franchises as possible. The First Amended Complaint has a lengthy general description of the alleged fraud scheme (Compl. ¶¶1-162) and specific allegations concerning the Loomis Group. Compl. ¶¶512-43.

12. The Loomis Group is operating one franchise, which allegedly has been unprofitable. Compl. ¶542. The Group also has contracted through the ADA for the right to operate

Case: 1:24-cv-10421 Document #: 1-4 Filed: 10/15/24 Page 4 of 14 PageID #:261

a total of six franchises. Compl. ¶512. "It is unclear whether they will be able to open their second location due to their past and ongoing losses and large amounts of additional capital needed for buildouts." Compl. ¶542. Under the ADA, the Loomis Group had to pay PFG a nonrefundable fee of $204,025 to reserve the right to purchase additional franchisees.[1]

13.    The complaint alleges 15 counts for violations of civil RICO, 18 U.S.C. 1962(c) and (d), fraudulent inducement, breach of contract, breach of the Duty of Good Faith and Fair Dealing, breach of Tennessee Code 47-18-101, state franchise and other laws, negligence *per se*, negligent misrepresentation, promissory fraud, constructive fraud, civil conspiracy, quantum meruit/unjust enrichment, and a request for a declaratory judgment.

14.    The Demand for Arbitration seeks damages for the Loomis Group of $1.7 million plus treble, statutory and punitive damages as permitted by law, a permanent injunction, interest, costs and attorney's fees.

15.    The Parties have now agreed that the Loomis Group should submit a separate statement of claim as this arbitration goes forward. This decision on arbitrability is, thus, preliminary and subject to reconsideration depending upon the specific allegations in the statement of claim and the evidence produced thereafter in this proceeding.

### C. Claimants' Arguments against Arbitration

#### (1) PMA Respondents

16.    The Loomis Group's Objection and Notice make the following arguments as to the PMA Respondents:

  a.  The issue of arbitrability must be addressed by the court and not the arbitrator. According to *Coinbase*, a court must decide whether the dispute should be arbitrated when there are multiple contracts like here.[2]

  b.  Due to the language of the arbitration clause in the Franchise Agreement, particularly §21.5, none of the claims are arbitrable except the breach of contract claims against PFG. The other claims, including fraud and RICO claims, are arguably not arbitrable.

17.    The PMA Respondents' responses to the Objection and Notice are as follows:

  a.  Although there are four contracts, *Coinbase* involved a subsequent contract without an arbitration clause; this case involves the Addendum and First Amendment, which were signed after the ADA and reaffirmed the arbitration clause. *Coinbase* is inapplicable or its holding leads to the conclusion that the

---

[1] Loomis Reply to PFG Response to the Notice of Supplemental Authorities, p.2.
[2] The Loomis Group argued that in a similar matter, the AAA determined that the case was not arbitrable because the Franchise Agreement has a clause in conflict with the AAA Rules, specifically the clause permitting default judgments. Objection, p. 2. The AAA withdrew that determination in a letter dated May 22, 2024 and reinstated the arbitration. This argument is, thus, withdrawn.

3

Case 3:22-cv-00416-CEA-JEM Document 214-1 Filed 07/15/24 Page 3 of 13 PageID #: 11905

        Parties agreed to arbitrate.

    b.    The terms of the arbitration clause and the AAA Rules delegate questions of arbitrability to the arbitrator. The provisions of the Franchise Agreement §§21.5 and 21.9 confirm that delegation.

    c.    On the issue of causes of actions, this arbitration is not limited to the contract claims, as Claimants argue. In §21.1, the Parties specifically agreed to arbitrate "all disputes and controversies," including fraud and misrepresentation. Section 21.6 specifically delineates those claims that "will not be subject to arbitration," which does not exclude fraud. The language of §21.5 limiting the arbitrator's authority to an award "relating to the interpretation of or adherence to the written provisions of this Agreement" does not negate that broad authority. This language means simply that the award must "draw its essence" from the agreement.

18.    In response to the PMA Respondents' arguments, the Loomis Group argues:

    a.    PMA Respondents gets it wrong when they argue that §21.5, limiting the arbitrator's jurisdiction to "interpretation of or adherence to the written provisions of this Agreement," does not "cabin" the broader, general language in §21.1. Claimants rely upon *United Steelworkers of Am. AFL-CIO-CLC v. Duluth Clinic, Ltd.*, 413 F.3d 786,790 (8th Cir. 2005), which interpreted similar language while the PMA Respondents cites no alternative caselaw. In Claimants' view, the only interpretation that gives meaning to both sections is its interpretation that §21.5 limits §21.1 to contract claims.

    b.    Claimants also contest the PMA Respondents' argument that §21.6, which excludes certain claims from arbitration, would be meaningless if §21.5 limited arbitration to contract claims. Claimants argue that §21.6 means that PFG does not have to get a ruling on arbitrability before seeking an injunction against, for instance, violations of a noncompete.

    **(2) FastLane and Mr. Seehohm**

19.    Loomis Group arguments against arbitration with FastLane and Mr. Seebohm are as follows:

    a.    No arbitration agreement exists between Franchise FastLane, LLC and Brent Seebohm and the Loomis Group. The only arbitration agreement is the Franchise Agreement, which arguably prohibits the Arbitrator in §21.7 from permitting third parties to participate in the arbitration.

20.    Respondents FastLane and Mr. Seebohm respond as follows:

    a.    They are proper parties to this arbitration because the Franchise Agreement §§21.6 and 22.3 includes PFG's "agents" in those subject to arbitration, and they fall within the definition of agents according to Claimants' allegations that

     they acted in PFG's behalf.

  b. They are also proper parties because Tennessee law includes non-parties under the doctrine of estoppel, as well as ordinary contract and agency principles.

21. In reply to the arguments of FastLane and Mr. Seebohm, Claimants argue as follows:

  a. FastLane's reliance on §§21.6 and 22.3 is misplaced. §21.7 is the more specific section that states the arbitrator is not authorized to permit "any other person or entity" to participate in the arbitration. That section limits the parties to officers, directors, owners and/or guarantors but does not include agents. Also, FastLane's own agreement with PFG states that it is not an agent, but an independent contractor.

  b. Claimants also argue that even if §22.3 applied, it would only apply after the Franchise Agreement was executed, but the claims arise from misrepresentations made to induce them to sign the Franchise Agreement.

  c. The other doctrine relied upon by FastLane – estoppel, agency, etc. – only apply when the contract is ambiguous which, Claimants argue, the Franchise Agreement is not.

### (3) Mr. Van Over

22. The Loomis Group's argument against arbitration with Mr. Van Over is as follows:

  a. No arbitration exists between Mr. Van Over and the Loomis Group, mirroring the argument for FastLane and Mr. Seebolm.[3]

23. Respondent Barry Van Over incorporates the arguments of the PMA Respondents and argues as follows:

  a. In the Objection, Note 4, Claimants said that §21.7 may be read to allow Mr. Van Over to participate in the arbitration, which arguably is a concession or waiver.

  b. Mr. Van Over, as CEO of the Loomis Group at the time of the relevant events, falls within the definition of "you and we" in §21.1. While the Loomis Group argues that he is being sued in his individual capacity, all allegations against him relate to his representative capacity as CEO of PFG, and the Franchise Agreement supports that conclusion by stating in §22.3 that Mr. Van Over acted "only in a representative and not in an individual capacity."

---

[3] In its original Objection, the Loomis Group did not make an argument that Mr. Van Over was not covered by the arbitration clause in the Franchise Agreement.

5

24. In reply to Mr. Van Over's arguments, Claimants argue as follows:

   a. Mr. Van Over's reference to §22.3 would only apply after Claimants signed the Franchise Agreement. This section would not apply to misrepresentations Mr. Van Over made to induce Claimants to sign the Franchise Agreement.

   b. In response to Mr. Van Over's argument that Claimants conceded §21.7 means he can participate in the arbitration, Claimants argue that §21.5 limits that section also, and since the claims are not contract claims, the arbitration clause does not apply to the fraud and misrepresentation claims against him.

**D. The Arbitration Agreement**

25. The Franchise Agreement dated June 23, 2021 between PFG and the Loomis Group has the following arbitration clauses, in relevant part:

> 21.1 <u>Agreement to Arbitrate</u>. …*all disputes and controversies* between you and we, including allegations of fraud, misrepresentation and violation of any state or federal law, rules or regulations, *arising under, as a result of, or in connection with this Agreement*, the PFG Studio or the Franchisee's Studio are subject to and will be resolved exclusively by arbitration conducted according to the then current commercial arbitration rules of the American Arbitration Association.
>
> 21.5 <u>Powers of Arbitrator</u>. The authority of the Arbitrator will be limited to making a finding, judgment, decision and award relating to the *interpretation of or adherence to the written provisions of this Agreement*. … The Arbitration will have no authority to add to, delete or modify in any manner the terms and provisions of this Agreement. …
>
> 21.6 <u>Disputes Not Subject to Arbitration</u>. Notwithstanding Section 21.1 or anything to the contrary in this Agreement, the following disputes between you and us *will not be subject to arbitration*: (a) your or your owners', employees', officers', directors' or agents' use of the System, Marks or Copyrights; (b) your obligations upon termination or expiration of this Agreement; and (c) your or your owners', officers', directors', employees' or *agents'* violation of the provisions of this Agreement relating to confidentiality and the covenants not to compete.
>
> 21.7 <u>No Collateral Estoppel or Class Action</u>. … You and we agree that no person or entity except *you and we*, and your and our respective officers, directors, owners and/or personal guarantors will have the right to join in, become a party, litigate or participate in any claims, … or arbitration proceedings arising under this Agreement …
>
> 22.3 <u>Your Acknowledgements</u>. You acknowledge and agree that: … (f) in all of their dealings with you, our officers, directors, employees and *agents* act *only in a representative, and not in an individual, capacity*. All business dealings between you and such persons as a result of this Agreement are solely between *you and us*.

6

26. The Area Development Agreement dated June 23, 2021 provides:

> 11. <u>Nature of Agreement</u>. This Agreement *only grants you the right to select sites* for the construction of Development Units and to submit those sites to us for our acceptance in accordance with this Agreement. This Agreement does not grant a license to use the name "Premier Martial Arts" or any other trade name, service mark, or trademark of ours. This Agreement does not grant you the right to open or operate any Premier Martial Arts studio. You will *obtain those rights only under a Franchise Agreement* with us, if and when fully executed and delivered by you and us.
>
> 19. <u>Entire Agreement</u>. This Agreement will constitute the entire agreement of the parties *with regard to the subject matter* of this Agreement and will replace and supersede all other written and oral agreements and statements of the parties relating to the subject matter of this Agreement. Neither party is relying on any writing to enter into this Agreement other than as set forth in this Agreement and the Franchise Disclosure Document delivered to you.
>
> 23. <u>Venue</u>. The *proper, sole and exclusive venue and forum* for any action arising out of or in any way related to this Agreement *shall be the federal and state courts* where our principal place of business is located at the time of filing. As of the Effective Date, venue shall be exclusive in the federal or state courts sitting in Knox County, Tennessee. …

27. The Entry Transfer Addendum dated August 16, 2021 provides, in relevant part:

> 8. This Entity Transfer Addendum constitutes the *entire and complete agreement* between Franchisor and Franchisee *concerning the subject matter hereof and supersedes* any and all prior agreements. …
>
> 9. This Entity Transfer Addendum forms an integral part of the [Franchise] Agreement. Except as modified or supplemented by this Entity Transfer Addendum, *the terms of the [Franchise] Agreement are hereby ratified and confirmed*.

28. The First Amendment to the Franchise Agreement dated March 1, 2022 states:

> The remaining terms of the Franchise Agreement are unaffected by this Amendment and remain binding on the parties.

**E. Applicable Law**

29. In its Memorandum and Order, pp. 4-6, the district court identified the applicable law, which is equally applicable to the pending motion.

30. The Federal Arbitration Act ("FAA") enables contracting parties to agree to settle certain contractual disputes with an arbitrator rather than a court. See 9 U.S.C. § 2. The FAA provides in pertinent part:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter <u>arising out of such contract or transaction</u>, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

31. The principal purpose of the FAA, as the Supreme Court recently emphasized in *Morgan*, is to ensure that private arbitration agreements are enforced according to their terms, just as with any other contract. *Morgan v. Sundance*, 142 S.Ct. 1708 (2022) (noting that the FAA's policy "is about treating arbitration contracts like all others").

32. In the absence of a delegation clause, a court asked to compel arbitration under the FAA has four tasks: (1) determine whether the parties agreed to arbitrate; (2) determine the scope of the arbitration agreement; (3) if federal statutory claims are asserted, determine whether Congress intended those claims to be nonarbitrable; and (4) <u>if some, but not all claims are subject to arbitration, determine whether to dismiss or stay the remaining proceedings</u>. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citing *Compuserve, Inc. v. Vigny Int'l Fin., Ltd.*, 760 F. Supp. 1273, 1278 (S.D. Ohio 1990)).

33. Consistent with the principle that "[a]rbitration is simply a matter of contract between the parties," the Supreme Court has made clear that parties may "agree to submit the arbitrability question itself to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *accord Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 527 (2019) (the FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes"). "After all, such an agreement is 'simply an additional, antecedent agreement' about who should decide these questions." *Blanton v. Domino's Pizza Franchising, LLC*, 962 F.3d 842, 844 (6th Cir. 2020) (quoting *Rent-A-Center W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010)).

34. Deciding whether parties have agreed to submit issues of arbitrability to arbitration is "fairly simple." *First Options*, 514 U.S. at 943. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agree to arbitrate that dispute," the question of who (the arbitrator or the court) decides the validity, scope, or enforceability of an arbitration agreement "turns upon what the parties agreed about *that* matter." *Id*. (emphasis in original). If there is "clear and unmistakable evidence" that the parties intended the issue of arbitrability to be decided by an arbitrator, "a court may not decide arbitrability questions." *Henry Schein*, 139 S. Ct. at 530. "That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id*. at 529. In the Sixth Circuit, "the incorporation of the AAA Rules (or similarly worded arbitral rules) provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'" *Blanton*, 962 F.3d at 845-46.

35. To the District Court's description, we add that the AAA Rules, R-7 Jurisdiction,

8

provides, in relevant part:

> a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.
>
> b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. …

36. The Parties delegated arbitrability issues to the arbitrator "because the parties incorporated the AAA rules into their Agreement." *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021).

### F. Analysis

#### (1) Claims Arising Under Four Contracts

37. The Loomis Group argues that because there is more than one contract, a court must decide the arbitrability issue. But that argument overstates the ruling in *Coinbase*, which involved two arguably overlapping contracts on the disputes issue: a general contract to purchase cryptocurrency with arbitration and declaration provisions and Official Rules of a sweepstakes with a forum selection clause providing for lawsuits in California courts. The dispute involved the sweepstakes; thus, it was ambiguous whether the general agreement or the Official Rules applied to the particular dispute. The Supreme Court decided that a court had to decide what the parties intended, specifically "whether *a particular dispute* is subject to that arbitration agreement." (Emphasis added).

38. In this case, the contracts specifically provide for different obligations and responsibilities and different fora for disputes. The division can most readily be seen in ADA §11, which states:

> 11. Nature of Agreement. This Agreement *only grants you the right to select sites* for the construction of Development Units and to submit those sites to us for our acceptance in accordance with this Agreement. This Agreement does not grant a license to use the name "Premier Martial Arts" or any other trade name, service mark, or trademark of ours. This Agreement *does not grant you the right to open or operate any Premier Martial Arts studio*. You will obtain *those rights only under a Franchise Agreement* with us, if and when fully executed and delivered by you and us.

(Emphasis added). The Franchise Agreement in §21.1 provides that the agreement to arbitrate applies to disputes "*arising under, as a result of, or in connection with this Agreement, the PFG Studio or the Franchisee's Studio*," which appear to cover disputes regarding inducement to sign the Franchise Agreement and operation of the franchise. Since the ADA §11 was signed the same day, the Parties' intent appears to be that disputes regarding site selection would go to court, while disputes regarding contracting for and operating the franchise would be resolved in arbitration.

39. The contracts, thus, make a specific delineation of rights and responsibilities between the ADA and the Franchise Agreement, and the First Amended Complaint makes a similar

9

delineation in its allegations. Specifically, the complaint alleges claims specifically naming the Franchise Agreement for "inducing Plaintiffs to become franchisees" while not mentioning the ADA. *See* Counts I (¶804), Count II (¶820), Count IV (¶¶829, 830), Count V (¶¶834, 836, 838), Count XI (¶881), Count XIII (¶889), and Count XIV (¶894). The ADA is not specifically mentioned until ¶844 in the claim for a declaratory judgment. Only Claims VI and VII asking for declaratory judgments specifically identify the ADA. *See* Count V (¶¶844, 847), Count VI (¶¶ 854-7). The other claims are more ambiguous but seem to be related to inducement to sign the Franchise Agreement and do not specifically mention the ADA. *See* Count III, Count VII-X, Count XII, Count XV. Even if these counts overlap, the allegations of inducement to open multiple franchises can be readily separated from the general inducement allegations. The damages arising from the ADA – the $204,025 fee – also appear to be distinct from those allegedly arising from the Franchise Agreement.

40. As the District Court pointed out citing *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000), the issue is whether the parties agreed to arbitrate specific issues, saying: "*if some, but not all claims are subject to arbitration, [the court] must determine whether to dismiss or stay the remaining proceedings pending arbitration*." Op. at 5. *Coinbase* did not disturb this law; it also put the jurisdictional analysis in terms of "*a particular dispute*." No. 23-3, 2024 WL 2333424 at *4. The two principal agreements here do not overlap. The subject matter of the Franchise Agreement is the execution of the Franchise Agreement and operation of the Loomis Group's franchise, as the ADA ¶11 makes clear. The subject matter of the ADA is the selection of sites.

41. Thus, the Parties agreed that claims arising under, as a result of, or in connection with the Franchise Agreement in any count in the First Amended Complaint should be resolved in arbitration, while claims arising under the ADA in any count in the First Amended Complaint should be returned to the District Court.

### (2) The Scope of the Arbitration Clause

42. This analysis raises the second issue about the scope of the arbitration clause in the Franchise Agreement. The Loomis Group argues that only the contract claims are arbitrable under the Franchise Agreement, while the Respondents argue all the claims are arbitrable.

43. The Franchise Agreement has two provisions specifically addressing the scope of the arbitration agreement: §21.1 has a broad arbitration provision providing for arbitration of "*all disputes and controversies* between you and we, including allegations of fraud, misrepresentation and violation of any state or federal law, rules or regulations, arising under, as a result of, or in connection with *this Agreement* …." Section 21.6 makes specific exceptions for disputes *inter alia* arising from marks and copyrights, termination, confidentiality and covenants not to compete, none of which are involved in this case.[4]

44. Section 21.5 limits the arbitrator's power to "*interpretation of or adherence to the written provisions of this Agreement,*" which the Loomis Group argues means only breach of contract claims can be arbitrated. However, the section does not mention contract claims

---

[4] Sections 21.12 and 21.13 have not been argued as affecting this issue.

10

specifically, and the Loomis Group provides no reason why the parties would agree to a broad arbitration clause for "all disputes and controversies" and then in a separate section limit the disputes to breach of contract claims. Respondents' interpretation is more reasonable. Section 21.5 means the arbitrator does not have the power to add to or delete provisions of the agreements but, as Respondents suggest, must draw its conclusion from the essence of the agreements.

45. As the Loomis Group points out, "In contract interpretation, it is well-settled that the particular and specific provisions of a contract prevail over general provisions." *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 794–95 (Tenn. Ct. App. 2009) (quotations omitted)). *United Steelworker* is not comparable. The parties there had a limited arbitration provision, which the court found did not cover the specific dispute at issue.

46. Thus, all claims arising under the Franchise Agreement, Addendum and First Amendment are subject to this arbitration.

### (3) Arbitration Agreement as to FastLane and Mr. Seebohm

47. The Loomis Group argues that it does not have an arbitration agreement with FastLane and Mr. Seebohm. The Franchise Agreement is between "you and we" and Section 21.1 is an arbitration agreement "between you and we." The issue is what does that phrase mean. Loomis Group points to §21.7, which states that "no person or entity except *you and we*, and your respective officers, directors, owners and/or personal guarantors will have the right" to participate in the arbitration, and the arbitrator "will not be authorized "to permit any other person or entity" to participate in the arbitration. The list in §21.7 does not include agents.

48. Respondents point to §§21.6 and 22.3(f). In the exclusions, §21.6 specifically excludes certain claims but includes agents as persons whose acts could cause a dispute, for instance, use of the "System, Marks or Copyrights." This clause arguably implies that agents are included in the arbitration agreement. Also §22.3(f) arguably has the closest language to a definition of "us" when it states: "in all of their dealing with you, our officers, directors, employees and *agents* act only in a representative … capacity. *All business dealings between you and such persons as a result of this Agreement are solely between you and us*."

49. The Loomis Group argues that the contract principle the specific rules over the general should control. Section 22.3(f) appears to have the most specific definition of the key language "we" and "us." However, the agreement makes multiple uses of the same language, which makes it ambiguous. At this stage of the proceedings, we will assume FastLane and Mr. Seebolm fall within the definition of agents based upon the allegations that the Loomis Group relied upon their representations on behalf of PFG. It also seems more likely that the Parties would contract to have all claims arising from the Franchise Agreement decided in one proceeding.

50. Respondents also argue that non-signatories are allow to enforce an arbitration agreement under the doctrine of estoppel relying principally on *Hughes Masonry Co. v. Greater Clark County School Building Corp.*, 659 F.2d 836 (7th Cir. 1981) that it would be "manifestly inequitable" to permit a plaintiff to rely upon an agreement in its complaint and then deny the applicability of the arbitration clause. *Id.* At 838-39. The Loomis Group's claims against FastLane and Mr. Seeholm arise from the Franchise Agreement. The Group argues that this principle only

11

applies when the agreement is ambiguous, which it is here.

51. The arbitration agreement in the Franchise Agreement, thus, is applicable to FastLane and Mr. Seeholm.

### (4) Arbitration Agreement as to Mr. Van Over

52. The Loomis Group argues that Mr. Van Over is not subject to the arbitration agreement in the Franchise Agreement because the dispute arises prior to execution of the Franchise Agreement and he is being sued in his individual capacity.

53. However, the disputes under the Franchise Agreement arise "in connection with" that agreement, which means that when the Loomis Group signed the Franchise Agreement, it agreed to arbitrate "all disputes," including pre-contracting disputes connected to the agreement.

54. Section 21.7 also provides that "officers, directors and owners" can join in the arbitration. The section does not distinguish between claims in the person's individual or official capacity. But, in any case, the Parties have agreed in §22.3 that all the conduct of the representatives are in their official capacity. Since the franchisor has not disclaimed Mr. Van Over's conduct and it was to advance the franchisor's alleged goal of signing up as many franchises as possible, the conduct alleged was in his official capacity at least at this stage of the proceedings. And the equitable estoppel principle would apply to Mr. Van Over also.

55. Mr. Van Over is, thus, subject to the arbitration agreement for claims arising under the Franchise Agreement, Addendum and First Amendment.

### G. Decision on Arbitrability

56. Based upon the current record, Arbitrator ORDERS as to arbitrability as follows:

    a. Claims in the First Amended Complaint against Premier Franchising Group LLC, Unleashed Brands, LLC, and Myles Baker arising under, as a result of, or in connection with the Franchise Agreement, Addendum and First Amendment will be resolved in this arbitration;

    b. Claims against FastLane and Mr. Seebolm arising under, as a result of, or in connection with the Franchise Agreement, Addendum and First Amendment will be resolved in this arbitration;

    c. Claims against Mr. Van Over arising under, as a result of, or in connection with the Franchise Agreement, Addendum and First Amendment will be resolved in this arbitration; and

    d. Claims against the Respondents arising out of or in any way related to ADA are

returned to the District Court for resolution.[5]

57. The cost and attorneys' fees associated with this motion will be resolved in the final award.

58. To the extent any arguments have not been specifically referenced in this decision, they have been considered and rejected.

DATED: July 15, 2024.

_____
Mark A. Cymrot
Arbitrator

---

[5] Given that the proof of fraud is likely to be overlapping and this Order is preliminary, subject to change based upon evidence in this proceeding, the District Court has the power to stay the ADA claims pending the outcome of this arbitration. The Federal Arbitration Act allows piecemeal, concurrent litigation where only some of the relevant issues are arbitrable. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Nevertheless, the Supreme Court has determined that "[i]n some cases ... it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court ... as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n. 23, (1983).